UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------x

UNITED STATES OF AMERICA,

        -against-                     **MEMORANDUM & ORDER**
                               20-MJ-0837(RER)

BAIMADAJIE ANGWANG,

                Defendant.

------------------------------------x

ERIC KOMITEE, United States District Judge:

        Defendant Baimadajie Angwang is charged with acting as an agent of a foreign government in violation of 18 U.S.C. § 951; wire fraud in violation of 18 U.S.C. § 1343; making false statements in violation of 18 U.S.C. § 1001; and obstructing an official proceeding in violation of 18 U.S.C. § 1512(c). The government appeals Magistrate Judge Lois Bloom's order of pre-trial release. For the reasons stated below, the Court orders Defendant detained pending trial pursuant to 18 U.S.C. § 3142(e).

## I.   Background

        Mr. Angwang, a New York City police officer, is charged with acting as an unregistered agent of the government of the People's Republic of China (PRC). The charges arise from his repeated contacts with officials at the PRC's Manhattan consulate. According to the Complaint, the Defendant began by 2018 (at the latest) reporting to PRC officials on the

1

activities of ethnic Tibetans in America.  Among other things, Mr. Angwang is alleged to have:

- offered assessments of ethnic Tibetans residing here who might be willing to serve as intelligence sources for the PRC;
- reported on Tibetans who had connections to New York State legislators, and might be disparaging the PRC;
- offered to provide non-public information on the internal operations of the NYPD;
- taken direction from PRC officials on whether to engage in certain public-relations activities in his NYPD capacity; and
- advised the officials on ways to expand the PRC's so-called "soft power" in New York.

FBI agents arrested Mr. Angwang on September 21, 2020. He was arraigned that day and detained at the Metropolitan Detention Center (MDC) in Brooklyn.  On October 1, 2020, Defendant moved for pre-trial release.  The government opposed the motion, contending that he posed a serious risk of flight.

Following a hearing, Magistrate Judge Bloom ordered Defendant released to home confinement (with electronic location monitoring) on a $1 million bond (co-signed by nine suretors) and subject to additional conditions.  *See* Order Setting Conditions of Release dated Oct. 2, 2020.  At the government's

request, Judge Bloom stayed the release order pending the government's appeal.  This Court heard Defendant's appeal later that day and reserved judgment, continuing the stay in effect pending supplemental submissions from both parties.

For the reasons explained below, this Court now finds that "no condition or combination of conditions will reasonably assure the appearance of" Defendant as required under 18 U.S.C. § 3142(e).  Accordingly, the Court reverses the release order and instead orders Defendant detained pending trial.

## II.  Discussion

District courts review *de novo* an order issued by a magistrate judge on bond.  *See United States v. Minnici*, 128 F. App'x 827, 828 n.1 (2d Cir. 2005).  To establish that pre-trial detention is warranted, the government must make two showings: "[f]irst, it must establish by a preponderance of the evidence that the defendant, if released, presents an actual risk of flight"; second, it "must then demonstrate by a preponderance of the evidence that no condition or combination of conditions could be imposed on the defendant that would reasonably assure his presence in court."  *United States v. Sabhnani*, 493 F.3d 63, 75 (2d Cir. 2007).  In determining whether the Defendant poses a risk of flight, the Court is required to consider the factors set out in Section 3142(g), including the nature and circumstances of the charged offense; the weight of the evidence

3

against the Defendant; and the Defendant's history and characteristics.

A.      Nature and Circumstances of the Charged Offense

The charge that Defendant acted as an "agent of a foreign government without prior notification to the Attorney General," 18 U.S.C. § 951(a), is serious by any measure. And certain aspects of this case make it more so: the secrecy and the covert reporting on fellow citizens; the Defendant's position of trust within the NYPD; and the allegation that he allowed his PRC "handlers" to guide him in his official duties. The parties dispute the significance of many of the specific wiretapped conversations excerpted in the Complaint. But at bottom, the Defendant is alleged to have collected information on the sentiments, attachments, and allegiances of residents of this country, and reported such information to agents of a foreign power — the nation's most prominent geopolitical rival. He did so while professing "100 percent" loyalty to the PRC's cause and urging his alleged handler to let Beijing know that "you have recruited one in the police department." Complaint ¶¶ 15, 18, 22.

Defendant's counsel downplays the seriousness of the allegations, noting that Mr. Angwang is not accused of divulging classified information. But that assertion merely explains why the Defendant is not charged with such disclosure (*cf.*, *e.g.*, 18

4

U.S.C. §§ 794, 798).  It should go without saying that a law enforcement officer's decision to act on behalf of a foreign government, and in so doing to inform on the activities of fellow citizens, can have serious repercussions even absent the passing of state secrets.  Moreover, the conversations intercepted by the government show the Defendant planning on at least one occasion to continue his conversation with the PRC official "the next time we meet."  Complaint ¶ 15.  This suggests that certain aspects of their conversations remain, for the moment at least, outside the documented record.

Defense counsel argues further that Mr. Angwang may have acted on an understandable impulse:  he wanted to visit his family in China, and his ability to do so depended on the good will of the PRC consulate.  Specifically, Defendant is said to have sought a ten-year visa (as opposed to a shorter travel authorization) — a privilege that his handlers had the authority to ensure that he was granted or denied.  But even if this is true, it goes merely to Defendant's motive, and not to the seriousness of his conduct.

"When the sentence . . . upon conviction is likely to be long . . . a defendant has stronger motives to flee." *United States v. Bruno*, 89 F. Supp. 3d 425, 431 (E.D.N.Y. 2015) (cleaned up).  For his alleged conduct, Defendant faces a cumulative statutory maximum of fifty-five years if convicted on

5

all counts.  There is no section of the Sentencing Guidelines
that is expressly applicable to offenses under 18 U.S.C. § 951.
Nonetheless, the government has made a compelling case that
Defendant would be likely to face at least a multi-year sentence
if convicted.  In its supplemental submission, the government
identified fourteen cases involving violations of Section 951,
with sentences ranging from eighteen to 120 months in length.
For example, the defendant in *United States v. Latchin* received
a forty-eight month sentence for immigrating to America as a
"plant" for Iraqi intelligence, despite there being no
indication that he provided any meaningful information once he
got here.  *See* No. 04-CR-00661 (N.D. Ill.), ECF Nos. 139, 239.
The defendant in *United States v. Buryakov* was sentenced to
thirty months for serving as an undercover Russian agent who
reported on various subjects of interest (mostly economic),
having met regularly with other agents in New York City and
elsewhere.  *See* No. 15-CR-00073 (S.D.N.Y.), ECF Nos. 1, 118,
157.  At the lower end of the spectrum, the defendant in *United
States v. Butina* was sentenced to eighteen months (even after
cooperating with the government) for cultivating relationships
that Russian officials could use to gain influence in the United
States.  *See* No. 18-CR-00218 (D.D.C.), ECF Nos. 1, 123.
Similarly, in *United States v. Soueid*, the defendant was
sentenced to eighteen months for collecting tapes of anti-Syrian

6

protestors and sending them to Syrian officials, among other things. *See* 11-CR-00494 (E.D. Va.), ECF Nos. 1, 66. These sentences are all of meaningful duration, and unlike Mr. Angwang, none of the listed defendants served in a United States law enforcement capacity. Accordingly, the nature and circumstances of the offense weigh in favor of detention.[1]

B.      The Weight of the Evidence

The weight of the evidence against the Defendant appears to be very strong, based on the government's interception of multiple telephone conversations between Defendant and PRC officials. This factor must be weighed with caution, inasmuch as the American legal system imposes no punishment for crimes prior to conviction. *See, e.g.*, *United States v. Paulino*, 335 F. Supp. 3d 600, 613 (S.D.N.Y. 2018). At this early stage in the proceedings, the Court reaches no conclusions about the merits of the government's case. But the existence of concrete evidence — like intercepted telephone recordings — may weigh against release when it sheds light on a defendant's role in an alleged crime. *See, e.g.*, *United States v. Fishenko*, No. 12-CR-626, 2013 WL 3934174, at *2

---

[1] Incidentally, in the majority of the most comparable of these cases, the defendant was detained pending trial. *See, e.g.*, *United States v. Butina*, No. 18-CR-00218 (D.D.C.), ECF No. 12; *United States v. Buryakov*, No. 15-CR-00073 (S.D.N.Y.), ECF No. 5; *United States v. Soueid*, 11-CR-00494 (E.D. Va.), ECF No. 25; *United States v. Duran*, No. 07-CR-20999 (S.D. Fla.), ECF Nos. 35, 114; *but see United States v. Latchin*, No. 04-CR-00661 (N.D. Ill.), ECF No. 12.

(E.D.N.Y. July 30, 2013) (evidence of "hundreds of pertinent recorded conversations and email exchanges that reveal [the defendant's] role in the conspiracy" weighed against release).

Here, the government has identified over a hundred electronic communications Defendant made to the two PRC officials, reaching back to 2014. Those conversations suggest that Defendant strategized with the two officials to expand the PRC's influence in New York, and that he took instruction from those officials. Indeed, in several of the recorded conversations, Defendant appears to describe *himself* as one who has "agree[d] to operate within the United States subject to the direction or control of a foreign government or official" as criminalized by Section 951(d). *See, e.g.*, Complaint ¶¶ 15, 18 (telling his PRC contact that the consular official had successfully "recruited" Defendant and "extended your reach into the police department"). When faced with a choice, Mr. Angwang appeared to prioritize the instructions of his PRC contacts over the wishes of his actual employer: the Complaint alleges that Defendant declined to appear for a press event the NYPD proposed that he do, because his PRC contacts instructed him not to. *Id.* ¶¶ 24-25. And he reported on local politicians, gatherings, and potential targets for the PRC to influence. *Id.* ¶¶ 16, 19, 20.

Finally, it appears undisputed that the Defendant made no "prior notification to the Attorney General" under those circumstances, as required by Section 951(a).  Thus the "weight of the evidence" factor, too, accordingly weighs in favor of detention.

C.    The Defendant's History and Characteristics

Defendant is a thirty-three-year-old ethnic Tibetan who arrived in America as a teenager.  He applied for asylum in 2005 based on allegations that PRC officials tortured him for advocating Tibetan independence.  He became a naturalized citizen in 2010.

Defendant clearly has strong ties to China, a country with which the United States has no extradition treaty.  His parents and brother still live there,[2] and he has traveled there with some regularity — including in the last several years.  *See* Pre-Trial Services Report at 2 ("Citizenship / Immigration Status / Passport Information"); Government's Supplemental Brief at 6, ECF No. 11 (stating that Mr. Angwang had returned to the PRC on "numerous occasions" since receiving asylum); Defendant's Supplemental Brief at 5, ECF No. 13 (not disputing that claim).  Indeed, the defense itself has argued that Defendant was

_____

[2] Although the parties dispute these allegations, the government claims Defendant's parents and brother are affiliated with the PRC government or Communist Party.  Complaint ¶ 28.

motivated to engage with his alleged handlers *because of* the strength of his ties to the PRC. *See* Defendant's Motion for Release from Custody at 4, ECF No. 8 (arguing that Defendant sought to ingratiate himself with PRC officials because he was "beholden" to them for a visa to travel to see his aging parents, which was becoming a "pressing concern"). Defendant has stated repeatedly that he would live in China again. *See, e.g.*, Complaint ¶ 20 (Mr. Angwang states that if he does not advance in his career, "I might as well be a government employee in China"); Government's Supplemental Brief at 8, ECF No. 11 (in a May 2008 television interview, Mr. Angwang stated that he plans to return to China following graduation). His wife has family in China, and their two-year-old daughter is not yet school-aged, thus lessening the potential social and familial cost of flight.

It also appears Defendant has access to significant financial resources. Bank records show large wire transfers passing through accounts associated with him or his wife. These sums allegedly totaled $270,000 — more than half of Mr. Angwang's entire net worth, as reported to the Pre-Trial Services Department. The size of these transactions suggests Mr. Angwang would be able to manage well abroad.

It is true that Defendant has established meaningful ties to his Queens community and to the United States. He has

lived in this country for over fifteen years.  He moved to New
York in 2014 and has served in the NYPD since 2016.  He owns a
house in Williston Park, Queens, where he lives with his wife,
two-year-old daughter, and mother-in-law.  Importantly, he
served in the United States Marine Corps from 2009 until 2014,
including a seven-month tour in Afghanistan.  It appears
Defendant served honorably, setting aside the instant
allegations, in the Marine Corps and U.S. Army Reserve.
Multiple members of his Marine unit have lined up to sign the
bond in this case.  This fact, especially, makes the Section
3142 analysis difficult.

Defendant's ties to the United States, however, must
be balanced against his ties abroad.  Moreover, his ties here
may be diminishing.  Following these charges, Defendant may
stand to lose his positions with the NYPD and U.S. Army Reserve,
and he may find it difficult (to say the least) to obtain new
government employment.  And as explained below, there is a
meaningful risk Defendant will not be able to remain in this
country following his conviction.

Finally, the analysis under Section 3142(g)(3) must
account for the Defendant's demonstrated capacity for
dishonesty.  *See United States v. Dreier*, 596 F. Supp. 2d 831,
832 (S.D.N.Y. 2009) (requiring stricter bail conditions for "a
master of deceit").  According to the allegations, Defendant has

lived a double life of sorts for much of his time in this country: he worked for the NYPD while allegedly taking direction from a PRC government official, including with respect to decisions about how he should conduct himself in his official capacity as a police officer.  The Complaint alleges, too, that Mr. Angwang made one or more false statements in the Questionnaire for National Security Positions that he signed as part of his renewal process to serve in the U.S. Army Reserve. There, he averred that he had no contact with members of a foreign government, in order to maintain his "Secret" security clearance.  Mr. Angwang is also alleged to have obstructed the national security background investigation that the U.S. Department of Defense conducted on him.

These allegations of deceit are, of course, contested at this stage; but there are indications of the Defendant's lack of candor with the Court even on the admitted facts. Specifically, arresting officials found both originals and copies of identification documents belonging to other people (including passports and drivers' licenses) in Defendant's home. To explain this, defense counsel asserted that Defendant worked as a "personal assistant" — for compensation — to one of the individuals whose documents he possessed.  But he did not disclose such work in relating his employment history to the Pre-Trial Services Department.  *See* Pre-Trial Services Report at

2 ("Employment History").  This dishonesty, directed to an arm
of the Court, militates in favor of detention.  *See United
States v. Berkun*, 392 F. App'x 901, 903-04 (2d Cir. 2010)
(holding that the "character" factor weighed against the
defendant with a "record of deceiving the court").  In the
aggregate, the "history and characteristics" factor ultimately
weighs in favor of detention.

    D.    <u>Potential Denaturalization</u>

       The government contends that Defendant is likely to
face denaturalization and removal following any prison sentence.
Despite the Court having called for additional briefing on this
point, it remains unclear what the outcome of any
denaturalization proceeding might be.  But the government has,
at this stage, certainly proffered a non-frivolous case for the
likelihood of denaturalization and removal.  Defendant averred
in his asylum application that he was "afraid to return to
China," but has voluntarily traveled there numerous times since.
While Defendant's views on this matter might very well have
changed, it is hard to ignore the seeming contradiction —
especially if Defendant did, in fact, state his intent to return
to the PRC in 2008, less than three years after seeking asylum.
Defendant also indicated in that application that he was not
"affiliated" with the Communist Party of any foreign state.
These statements, too, may have been false, which could

jeopardize his ability to stay in the United States.  *See*
8 U.S.C. § 1451 (citizenship may be revoked if it was "procured
by concealment of a material fact or by willful
misrepresentation").

E.    No Conditions or Combination of Conditions Can
      Reasonably Assure Defendant's Appearance in Court

Altogether, this is a close case under Section 3142,
given the Defendant's time in the community, his military
service, and the fact that the government does not contend
(based on what it knows now) that he is facing a sentence at the
highest end of the Section 951 universe.  Nonetheless, given the
seriousness of the charged offense and the other Section 3142(g)
factors assessed above, the Court finds by a preponderance of
the evidence that Defendant poses a serious risk of flight.  The
Court also finds that the proposed combination of conditions
(including home confinement with electronic monitoring,
surrender of passports, travel restriction, the $1 million bond
and multiple suretors) cannot reasonably ensure his appearance
under Section 3142(e).  Electronic monitoring can alert the
authorities to flight, but not prevent it.  *See United States v.
Benatar*, No. 02-CR-99, 2002 WL 31410262, at *3 (E.D.N.Y. Oct.
10, 2002) ("[H]ome detention with electronic monitoring does not
prevent flight; at best, it limits a fleeing defendant's head
start.") (quoting *United States v. Zarger*, No. 00-CR-773, 2000

14

WL 1134364, at *1 (E.D.N.Y. Aug. 4, 2000)); *see also United States v. Orena*, 986 F.2d 628, 632 (2d Cir. 1993) (recognizing that electronic monitoring can be circumvented).  There is no way of ensuring that Defendant does not have access to other travel documents, especially given that several were found in his home.  *See* Government's Response to Defendant's Motion for Release from Custody at 2-3, ECF No. 9; *see also, e.g., United States v. Bonilla*, 388 F. App'x 78, 80 (2d Cir. 2010) (defendant posed risk of flight even though he surrendered his passport and had close family in New York, because he had relatives in another country and had made frequent trips there in recent years).  When weighed against the other factors present here, the moral suasion associated with the many suretors' willingness to sign the bond could, in the end, prove no match for the temptation of flight.

Having carefully evaluated Defendant's bail proposal under the circumstances of this case, the Court concludes that there is no condition or combination of conditions that will reasonably assure his appearance at trial.

### III. Conclusion

For the reasons stated above, the Court orders that Defendant be detained pending trial.  Defendant shall be committed to the custody of the Attorney General for confinement in a corrections facility separate, to the extent practicable,

from persons awaiting or serving sentences or being held in
custody pending appeal.  Defendant shall also be afforded
reasonable opportunity for private consultation with counsel.

SO ORDERED.

_/s Eric Komitee_____
ERIC KOMITEE
United States District Judge

Dated:    October 7, 2020
          Brooklyn, New York