# LAW OFFICE OF JOHN F. CARMAN

Attorneys at Law

OF COUNSEL
SUSAN SCARING CARMAN, ESQ.
MATTHEW W. BRISSENDEN, ESQ.

666 Old Country Road
Suite 501
Garden City, New York 11530
(516) 683-3600
Facsimile
(516) 683-8410

ASSOCIATE ATTORNEY
SARA M. PERVEZ

PARALEGAL
ANNA M. SACCO

February 2, 2021

**VIA ECF**
Honorable Eric Komitee
United States District Judge
Eastern District of New York
225 Cadman Plaza East
Brooklyn, New York 11201

      *Re:*    *United States v. Baimadajie Angwang*
                *Docket No. 20-cr-442*

Dear Judge Komitee:

    Please accept this letter in support of Mr. Angwang's request that he be released from the inhumane conditions at MDC. Release from confinement is justified by; 1) a substantially augmented bond package; 2) deplorable conditions at the MDC; 3) the impact confinement is having on Mr. Angwang's access to counsel and his ability to participate in his defense; 4) and the flawed theory of this prosecution that is emerging from the government's disclosure.

    **1.**    **PREVIOUS BOND PROPOSAL**

    Shortly after his arrest on September 21, 2020, Mr. Angwang proposed a bail package that included a one-million-dollar bond with collateral in the form of his home on Long Island where he lived with his wife and two-year-old daughter, both American citizens. The equity in the home was, and remains, close to $450,000. Mr. Angwang also proposed home detention with location monitoring with passport and travel conditions. In addition, nine financially responsible suretors were interviewed at the bail hearing and offered to sign on to the million-dollar bond. Four of the suretors are veterans of the United States Marine Corps. who had served with Mr. Angwang.

    As you are aware, the bond was granted by Magistrate Judge Lois Bloom, an order that was reversed by Your Honor a week later. In your decision, you described the denial of bond as a "close case under section 3142." (decision at page 14.) Nevertheless, the denial was affirmed by the Circuit Court.

1

*ENHANCED BOND PROPOSAL*

Given the desperate conditions at the MDC and the extent to which the Covid virus have rendered it impossible for Mr. Angwang to play a meaningful role in the defense of his case, each of the original suretors has agreed to sign on to a bond in the amount of two million dollars. In addition, Mr. Angwang's new proposal includes additional collateral, including the residence of one of the previously proposed suretors, as well as, the home of his wife's father. The residences are both condominium units in Maryland worth approximately $400,000 and $120,000. The owners are willing to sign the two-million-dollar bond. Finally, we anticipate four additional suretors will step forward to sign on to the bond.

2. **CONDITIONS AT MDC**

*HEAT LOSS*

Since his arrest in September, the living environment at MDC has steadily deteriorated. As of today, February 2nd, Unit 83 has been without adequate heat for five days. I am getting daily emails from my clients who are telling me that the temperature is below 50 degrees and colder in the cells. Moreover, there is a shortage of blankets. MDC policy prohibits family from ordering blankets for inmates.

The loss of heat in winter is not a first for the MDC. In 2019, there was a black out and no heat during a cold snap that lasted more than a week. I recall my clients, most of them pretty tough people, on the verge of nervous breakdowns. History is repeating itself.

*COVID QUARANTINE*

BOP's plan to control the spread of the virus by "quarantining" (i.e., locking down) inmates has been exposed for what it was, wholly ineffective. Since his arrest, Mr. Angwang has spent more than 75 days in "lock down." "Lock down" means that inmates are confined to their cells 24 hours per day. On January 26, 2021, inmates were notified that due to five inmates testing positive for Covid, a 21-day lock down was to "begin." During this period, inmates are only permitted out of their cells for 30 minutes on Monday, Wednesday and Friday.  Otherwise, they are confined to their cells. This notice of lockdown follows a lockdown order that began on January 16, 2021 (Notice from MDC Director Carvajal attached) and a series of others that have preceded them.

When not in "lockdown", MDC has employed a "partial lockdown" mode.  In partial lockdown, inmates are permitted two hours per day out of their cells. Of his four months at MDC, Mr. Angwang has been subjected to 47 days of "partial" lockdown.

Notwithstanding these extreme measures, Covid spread at MDC is out of control. Both employees and inmates alike have been stricken with the virus in escalating numbers. As of January 29, 2021 the BOP website reported that there are 50 "active"

cases among inmates and 28 among staff. While BOP has been reporting an increase in confirmed cases, the reality is far worse than what is being represented to the public. Based upon conversations with Mr. Angwang and my other clients at MDC, the situation is not only out of control, there are also severe shortages in medical resources and personnel. In a call this morning with Mr. Angwang – which was scheduled to be tomorrow – I was advised that he is now experiencing classic symptoms of Covid: loss of smell, headache, cough and swollen throat. If positive, he expects that he will be assigned to the SHU for 21 days without any access to phone or email.

In early December, Mr. Angwang requested medical attention due to a bloody discharge coming from his ears, an issue I raised with the Court at the last conference. Since that time, I enlisted AUSA Haggans to assist with having the condition addressed. As of January 29, 2021, the last time I heard from him, Mr. Angwang has received no medical attention and was specifically told that if his condition was not "life or death," he would "have to wait." AUSA Haggans agreed to make another call, but expressed no confidence that intervention by his office would resolve the problem.

The Court should also be aware that MDC has proven itself incapable of providing an environment for the inmates that is CDC compliant. The sharing of laundry, phones and computers, and a lack of mask wearing by staff are, no doubt, contributing to the high rates of infection that are being reported.

In December, Mr. Angwang was advised that the protective custody unit was being "discontinued" and he was being transferred to general population, notwithstanding his history of employment in law enforcement. Although probably the least of his worries, that transfer occurred in early January.

*VISITATION*

The dire nature of the Covid situation at MDC is underscored by the fact that attorney and visitation has been "suspended" since the first week in November of 2020. I have had one in person visit with Mr. Angwang on November 3rd 2020, almost three months ago. We have once-weekly phone calls that last thirty minutes and must be set up days in advance.

In the four months since he has been arrested, Mr. Angwang has seen his wife on just one occasion, in early November. He has not seen his daughter since the date of his arrest. Family visitation is also suspended and no date has been set to resume visitation for attorneys or families. The social isolation of the lockdowns, combined with no visitation, and limited phone access is extreme.

3. **NO TRIAL PREPARATION – EXTREME DELAYS**

On December 23rd 2020, two months after the initial appearance, the government transmitted its first Rule 16 production. Among the 1,500 or so documents provided are 160 pages of English translations of conversations that occurred in Mandarin. While I

have provided the transcripts to Mr. Angwang, we have had no meaningful opportunity to review this information that forms the basis of the government's case.

On January 13, the government provided an external storage device which apparently contains forensic images of "certain electronic devices and electronic media seized during the search of defendant's premises." (Rule 16 letter dated January 13, 2021.) While the storage device is supposed to be "plug and play," trying to access it is akin to walking through a 100,000 square foot warehouse in the dark. There appear to be several terabytes of information, files that will not open and no index from which to organize a search.

To top it off, the device has been designated "sensitive discovery material." Although AUSA Haggans has candidly acknowledged that he is not aware of even one "sensitive" document or file on the device, the protective order restricts the defense from turning over the device to the defendant's wife to assist in the review of the contents at her home. Of course, the idea that the contents could be shared with, and analyzed by Mr. Angwang, is a non-starter.

*GOVERNMENT'S CIPA AND COMPLEX CASE APPLICATION*

Now pending before the Court is a motion by the government requesting a pretrial conference pursuant to the Classified Information Procedures Act, as well as, a motion to designate the case complex. These motions do not bode well for Mr. Angwang's right to a speedy trial. While we maintain that there is absolutely no relevant evidence that is either sensitive or secret, the procedures the government seeks to have the Court impose upon this case will have no purpose, other than to cause extensive and unnecessary delays of the trial. They will also serve to prolong the period during which Mr. Angwang will be forced to endure the sadistic confinement conditions at MDC, if he is not granted bond.

The government also seeks a "complex" case designation, another potential blow to Mr. Angwang's right to a speedy trial. While counsel's lack of access to a client makes the preparation of a defense nearly impossible, it does not necessarily make the case complex.

4. **PREVIEW OF THE CASE**

In a perfect world, Your Honor would have the opportunity to review the English translations of the many conversations between PRC #2 and Mr. Angwang before deciding this request for bond. Only by reading them, does it become readily apparent that the government cherry-picked phrases and excised context in order to present a picture of Mr. Angwang for the Court that fit their hyper-suspicious view of his relationship with PRC#2.

As we have said before, Mr. Angwang cultivated the relationship with PRC#2 for one reason: PRC #2, an ethnic Tibetan, was the community liaison for the Chinese consulate. PRC #2 was exclusively vested with the power to grant or deny visas

4

applications for ethnic Tibetans in the New York area who sought to return to China. Mr. Angwang was one such ethnic Tibetan.

We are only now learning about the Chinese "social credit system" which is used by the government to deny Chinese citizens the right to travel within the country where they have been deemed "untrustworthy" or have spread "false information." It has long been that case that ex-patriot ethnic Tibetans have suffered from severe restrictions on their ability to obtain visas based upon the same concerns. The Chinese government routinely withholds travel permission from anyone who has a demonstrated history of criticizing the PRC government or who is, merely Tibetan.

The entirety of the back and forth between Mr. Angwang and PRC #2, takes place against this backdrop. Mr. Angwang plies PRC #2 with compliments and respect and at all times adopts a solicitous and reverential manner – all with a view towards making sure that he says or does nothing that would give PRC #2 concern about vouching for him. Throughout, it is clear that Mr. Angwang's purpose for having these conversations is to open PRC #2 up to the idea of recommending the relaxation of visa restrictions for Tibetans. Mr. Angwang can be seen not only lobbying for his own visa, but for all ethnic Tibetans who desire improved opportunities to visit the place of their birth. The idea that Mr. Angwang is an "intelligence asset" collecting information about his fellow Tibetans is simply not borne out by the transcripts of the conversations.

## **CONCLUSION**

The Covid pandemic has created unforeseen challenges to the criminal justice system, especially those who are responsible for the care of citizens who are incarcerated. Yet, Mr. Angwang, who is presumed innocent, has already endured four months of living conditions that we would consider a violation of his human rights if he was incarcerated by the PRC.

For all of these reasons, Mr. Angwang's request for bond should be granted. Thank you for your consideration.

Respectfully submitted,


/s/ John F. Carman
JOHN F. CARMAN
(JC 7149)


Encl.
JFC/as