UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------------X

UNITED STATES OF AMERICA,                    Docket No. 20-CR-442 (ERK)

                                             **AFFIRMATION IN SUPPORT**
-- against --

BAIMADAJIE ANGWANG,
                         Defendant.
-------------------------------------------------------------X
NASSAU COUNTY      )
                   ).:
STATE OF NEW YORK  )

**JOHN F. CARMAN**, an attorney admitted to practice in the courts of the State of New York and in this Court, affirms under penalty of perjury pursuant to 28 U.S.C. § 1746 that the following is true and correct, upon information and belief and to the extent of his knowledge:

1. I am the attorney for the Defendant in the above-captioned matter and as such am fully familiar with the facts and circumstances thereof. I make this Affirmation in support of the Defendant's motion to dismiss the indictment, or alternatively specific counts thereof, pursuant to Fed. R. Crim. Pro. 12(3)(A) and (B). The sources for the allegations of fact made herein include conversations with my client, review of the case file and review of other pertinent documents.

2. As set forth below, it is the defendant's position that, in light of the charging terms of the indictment, as well as evidentiary materials that this Court may consider, the indictment fails to state an offense. Specifically, defendant contends that his interactions with two officials of the New York City consulate of the People's Republic of China, do not involve "direction or control" without which there is no relationship of foreign agency. See United

1

States v. Rafiekian, 991 F.2d 529, 538-40 (4th Cir. 2021). Moreover, as to the counts of the indictment that relate to alleged false statements on his 2019 SF-86C security clearance addendum form, defendant submits that the government cannot prove that these statements were false. The instructions for the form, did not require disclosure of foreign contacts pertaining to obtaining of visas and, as to the "bonds of affection" question, involved relationships that had been specifically and repeatedly disclosed by the defendant in the various SF-86 forms that he completed. Thus, for the reasons and based on the authorities cited below, the indictment, or alternatively specific counts thereof, should be dismissed.

## RELEVANT FACTS

**A.    Mr. Angwang's Background.**

3.    By now, after the extensive bail litigation, defendant Angwang's background and his service to this country and city are well known to the Court. Mr. Angwang was born in the Tibetan area in 1986. He and his parents are ethnic Tibetans.

4.    At the age of 17, local Chinese authorities, suspicious of his contact with an uncle who had fled China and obtained asylum in the United States, arrested him and held him for several days, during which time he was beaten. After his release, he managed to leave his hometown ultimately coming to the United States to live with his uncle. Under his uncle's guidance, he applied for asylum, which was initially denied due to a lack of proficiency in English which affected his ability to communicate his story to the interviewer without the benefit of translation. He was later granted asylum after the application was reheard with the assistance of a Court translator.

5.    While waiting for his asylum application to be approved, Mr. Angwang studied English and came to appreciate his new home in America. It was during his English study that

2

he conceived the idea of enlisting in the military to show his gratitude to this country for giving him a home. Once his asylum came through, Mr. Angwang joined the United States Marine Corps, signing a four-year contract on April 4, 2009. He was assigned as an Individual Material Readiness List Asset Manager at an aviation squadron. His primary job was to ensure that the aircraft technicians had the equipment and resources they needed to maintain flight readiness.

6. In 2013, as his contract was ending, his unit was preparing to deploy to a combat zone in Helmand Province, Afghanistan, the most dangerous part of the country. Rather than leave the service, Mr. Angwang volunteered to extend his contract so that he could travel with his unit to Afghanistan, a decision he says rested on his continuing desire to show his gratitude to the United States. From July 2013 to February 2014, Mr. Angwang served with his fellow Marines in Afghanistan, serving under enemy fire and becoming a combat veteran. This Court, even in denying Mr. Angwang's initial application for bond, described his service as honorable. (See military documentation annexed as Exhibit A).

7. In April 2014, Mr. Angwang was honorably discharged from the Marines with full Veterans Administration benefits. Again, looking to express his appreciation to the country that adopted him, he joined the Army Reserve. While the pay was minimal and his status as a reservist exposed him to the potential for deployment to a combat zone, Mr. Angwang gladly accepted these risks. He was assigned to a civil affairs unit, where he continued to serve until his arrest in this case.

8. In the meantime, Mr. Angwang, still desiring to serve his country and city, applied for a job with the New York City Police Department in 2015. His application was successful and, after completing the academy, he was assigned to the 111th Precinct in Queens. This was an assignment he welcomed because the precinct had a large Asian population,

including members of the Tibetan diaspora. As a police officer, he performed at a high level. He brought a unique ability to bear that allowed him to defuse potentially confrontational encounters between law enforcement and members of the Asian community by acting as both a linguistic and cultural interpreter. As an example, when a rash of burglaries struck Asian-owned stores, Mr. Angwang coordinated meetings between the store owners and the police, training them to better protect themselves against crime and developing information about the burglary pattern. Mr. Angwang's efforts as described above, as well as others, were so successful that he was appointed the precinct community affairs officer, a status that conferred upon an officer who is trusted and who has the maturity and people skills to maintain good relations with the diverse people of New York City. He was also highly regarded by his fellow officers, his superiors and the community and was awarded "Cop of the Month" in 2018. (See commendation annexed as Exhibit B).

**B.     The Alleged Relationship with PRC Officials.**

9.     The charges in this case have their genesis in Mr. Angwang's alleged contacts with the Chinese consulate, and in particular with two officials (named in court papers as "PRC Official #1" and "PRC Official # 2") who were in charge of vetting visa applications by members of the Tibetan diaspora. As has been explained in prior submissions to this Court, overseas Chinese people who want to travel to China whether for business, to visit family, or for tourism, may obtain a 10-year visa by filing a simple application at a tourism agency with a nominal fee.

10.     For overseas Tibetans, however, the routine process is grueling. They are eligible only for single-entry visas, and in order to apply for the visa, they must be personally interviewed by the designated official at the consulate. Their family members in China are also

4

subject to interview and investigation. The visas that are issued are typically for a thirty-day period or less if granted at all.

11. The consulate officials in New York City, known as PRC#1 and PRC#2, were low-ranking and not authorized to give final approval to entry visas for Tibetans. They were merely initial gatekeepers who controlled the first stage of the process, but no visa would be granted unless the application was passed on to higher-ups. The officials could refuse to pass on the application for any reason or none – and there was no appellate process. Therefore, it is of obvious importance for any member of the Tibetan diaspora who wishes to obtain a visa to seek to establish relationships with these officers. Moreover, it was necessary to maintain such relationships on an ongoing basis as an overseas Tibetan who wishes to travel to China can expect to suffer through the same process again and again - for every new visa application. Either of these officials could singlehandedly prevent him from going to see his family, so he of course treated them with respect, addressing them by such honorifics as "elder brother," which is used to denote a familiar but respectful relationship.[1]

12. In 2012, due to a serious illness, Mr. Angwang needed to go to China to see his mother.[2] This brought him into contact with PRC Official #1 for the first time. Mr. Angwang's only previous attempt to return to China came in 2011, when he applied for a visa at the Chinese consulate in Los Angeles, while serving in the Marine Corps. That request was denied.

13. In 2015, Mr. Angwang requested a second, thirty-day visa and was granted permission to travel for 14-days to Tibet by PRC#1. This travel was reflected in Mr. Angwang's 2019 SF-86C.

---

[1] Several of the court papers reflect that he also called one or both of the PRC officials "boss." Upon information and belief, these were also instances in which he used "elder brother," the term for which in Mandarin sounds very similar to the term for "boss."
[2] This trip is documented in Mr. Angwang's 2014 and 2019 SF-86 forms.

5

14. In 2016, Mr. Angwang's personal circumstances changed in a manner that gave him additional reasons to seek permission from the consulate to travel to China. In 2016, he was married to his wife Heidi, and in 2017 the couple had a daughter. With Mr. Angwang's parents still in his hometown and his wife's grandparents still alive, thoughts of returning to visit aging relatives and to introduce the new grandchild were central to Mr. Angwang's focus. To this day, his daughter has not met her great-grandparents or Mr. Angwang's parents.

15. In addition to obtaining a visa for himself, it is evident from the intercepted conversations that Mr. Angwang was advocating for the Tibetan-American community as a whole. In particular, he sought to persuade PRC#2 to entertain the idea of allowing overseas Tibetans to become eligible for 10-year visas such as were given routinely to non-Tibetan, overseas Chinese people. He noted that many Tibetans were apolitical in an effort to convince PRC Official #2 that much of the Tibetan community was not in solidarity with the independence cause. PRC#2 responded by saying in effect, "that ain't happening."

16. It is submitted that the foregoing explains what was actually occurring in the key intercepted conversations that, in the opinion of the government, are indicative of Mr. Angwang acting nefariously as an intelligence asset for the Chinese. Rather than being an employee of the PRC Officials or acting under their "direction and control", the relationship Mr. Angwang created and cultivated was designed to benefit only himself, and perhaps the Tibetan diaspora. He did not ask for or receive compensation, nor did he provide any information that could reasonably be described as "intelligence." Most importantly, he never received a visa, either a 30-day permission or the ten-year version from PRC #2, pretty shabby treatment for a prized intelligence asset.

17. Furthermore, Mr. Angwang used his personal cell phone when he communicated with both PRC officials. He used no encryption for calls or texts and never used a burner phone. He engaged in innocuous conversations including one about a "new Tibetan-American community center" in Queens. Rather than revealing the location of a secret hideaway, the discussion pertained to the grand opening of a facility that was well-publicized and located in a building the size of a Costco.

18. Defendant also notes that many of the interactions that he is accused of having with the PRC Officials are entirely normal and within the scope of the community relations that consulate officials regularly undertake. For instance, the Asian Jade Society Dinner, which is sponsored by the not-for-profit NYPD Asian Officer Fraternity is an annual, <u>unofficial,</u> and hardly exclusive event attended by more than 1,600 people. The dinner is routinely attended by foreign dignitaries and ambassadors throughout the city including high ranking members of the Chinese consulate. If anything, PRC #2 was the lowest-ranking consulate official in attendance, a fact confirmed by photos showing that Mr. Angwang and PRC#2 located nowhere near the VIP section. It is of course, standard operating procedure for foreign officials and diplomats to establish relationships with local law enforcement, other organs of government, and organizations representing their country's diaspora, and for such governmental bodies and community organizations, in turn, to interact with consulate officials for the purpose of maintaining normal working relationships.

19. Mr. Angwang's status as a member of the Army Reserves with a "secret" security clearance (which will be discussed further below) has also garnered attention in this case. The government, however, does not even allege that Mr. Angwang passed classified, sensitive **or any other** information about the military to either of the consulate officials. Indeed, from the

7

transcripts of 55 intercepted calls, it is crystal clear that Mr. Angwang never even told PRC #2 that he was previously in the Marine Corps., or at the time of the calls, in the Army Reserves.

20. Apart from an invite to a boring, over-attended gala that anyone could get into, Mr. Angwang did not give anything to PRC #2. He definitely did not give information from or about the NYPD that could be used by China to the detriment of anyone. As for China's desire to increase its "soft power," it would seem that if anywhere, the VIP section of the Asian Jade Dinner would be a place to look.

C. **The Security Clearance Applications.**

21. Charges in this case also arise from a Questionnaire for National Security Positions that Mr. Angwang submitted on or about May 17, 2019. The filing was to renew the secret clearance that he was required to maintain as a member of the Army Reserve civil affairs unit to which he was assigned. (Exhibit C, under seal).[3] This application, called a SF-86C form, was a renewal of two prior applications that Mr. Angwang had completed in 2011 and 2014 during his service with the Marine Corps. (Exhibits D-E under seal). The instructions on page 2 of the 2011 application (Exhibit D- under seal) read in pertinent part as follows:

> "This form is a permanent document that may be used as the basis for future investigations, security clearance determinations, and determinations of your suitability for employment. Your responses to this form may be compared with pervious security questionnaires". (*emphasis added*).

It is thus necessary to discuss all three applications in order to establish the basis for this motion.

---

[3] It is noted that a Secret clearance is the lowest security clearance that can be granted, and is given to many officers and enlisted members of the military even if they rarely or never deal with classified information. 99% of applications are approved and access to classified information is not possible without further clearances.

The 2011 Questionnaire

22. The 2011 questionnaire was submitted on or about February 2, 2011 in connection with his service with the Marine Corps. In question 18, Mr. Angwang was asked to list relatives including, his mother, father and brother. In response to this question, he disclosed that his mother, father and brother were citizens of China, living in China.

23. Question 19 asked whether Mr. Angwang "had close and/or continuing contact with foreign nationals, within the last 7 years with whom you, your spouse, or your cohabitant are bound by affection, influence and/or obligation? Include associates, as well as relatives, *not already listed in Section 18*" (emphasis added). Mr. Angwang answered "no," which was and is truthful, because he had already disclosed his mother, father and brother in response to question 18.

24. Question 20B(4) asked Mr. Angwang whether in the past seven years he or any of his immediate family members "had any contact with a foreign government, its establishment (embassies, consulates, agencies, or military services), or its representatives, whether inside or outside the US." Mr. Angwang answered "no," which was and is a truthful answer.

The 2014 Questionnaire

25. The 2014 questionnaire was filed on July 3, 2014, the day that Mr. Angwang was sworn into the Army Reserves. He completed the form with assistance from the recruiter at Fort Hamilton. The form was in the same format as the 2011 form and contained exactly the same questions 18 and 19, which Mr. Angwang answered in the identical manner. However, for Question 20(B)(4), pertaining to Foreign Government Contact, additional instructional language was added to the 2014 form. In the 2011 version of Question 20(B)(4), (Exhibit D – under seal) the language had read as follows:

> "In the last 7 years, have you or any of your immediate family members had any contact with a foreign government, its establishment (embassies, consulates, agencies, or military services), or its representatives whether inside or outside the U.S.?"

The SF-86 form was thereafter modified, likely in October of 2011, to add the following language immediately after the language above:

> "[a]nswer "No" if the contact was for *routine visa applications* and border crossings related to either official U.S. Government travel or foreign travel on a U.S. passport" (Exhibit E at p. 26 – under seal). (*emphasis added*).

26. Mr. Angwang answered the question, as redefined, in the negative. The negative answer was true at the time he completed the form and remains so today.

27. As discussed earlier, Mr. Angwang had traveled to China in 2012 and in 2015. In so doing, he had engaged in Foreign Government Contact, specifically with PRC #1 who processed Mr. Angwang's visa application and conducted his "investigation." While not normal by U.S. standards, the visa applications were *routine* for an overseas ethnic Tibetan seeking permission to travel for China for thirty days. The "routine" included countless phone calls, interviews as well as multiple visits to the consulate. It should be noted that Mr. Angwang also travelled to St. Kitt and Nieves during this interval and obtained visas for travel to those locations. Those processes, while much easier, were also "routine". Thus, his answer to question 20(B) (4) on the 2014 application was truthful in all respects.

The 2019 Questionnaire

28. The May 2019 questionnaire was styled as an "addendum" to his prior security filings and was referred to as SF-86C. (Exhibit C – under seal). The addendum was completely re-designed, and the questions were renumbered. Incidentally, Mr. Angwang was not given copies of his prior applications to review in order to give him a reasonable opportunity to compare how the questions and instructions were previously phrased and how he had answered.

29. With respect to questions 18 and 19 from the 2011 and 2014 editions about "contacts with those with whom you are bound by affection", the 2019 addendum captured that question in question 5. It reads as follows:

> "Since your last SF-86, do you have, or have you had, close and/or continuing contact with a foreign national with whom you, your spouse, cohabitant, are bound by affection, influence, common interests, or obligations? If yes, provide the following information: Full name occupation, employer, approximate date of first contact, methods of contact, frequency of contact, nature of relationship, country of citizenship, telephone number, email address, is this foreign national affiliated with a foreign government, military, security, defense industry, or intelligence service." *(emphasis added).*

30. In answer to this question, which is beyond confusing when considered in light of the previous iterations, Mr. Angwang, answered "No." In this context, a "no" answer can only reasonably be interpreted one way – "I have had no close contact with any other foreign nationals since my last SF-86, apart from the three people in my family that I not only listed on my 2014 questionnaire, but my 2011 questionnaire as well."

31. With respect to question 20(B) (4), from the 2011 and 2014 questionnaires, the inquiry regarding Foreign Government Contact can be found on question 6 of the redesigned addendum. (Exhibit C – under seal). The language tracks the 2011 questionnaire but omits the instructional language from 2014 regarding "routine visa applications". It reads as follows:

> "Since your last SF-86, have you or any member of your immediate family had any contact with a foreign government, its establishment (such as embassy, consulate, agency, military service, intelligence or security service, etc.) or its representatives whether inside or outside the U.S.? If yes, provide the following information: Full name, occupation, employer, approximate date of first contact, methods of contact, frequency of contact, nature of relationship, country of citizenship, telephone number, email address, is this foreign national affiliated with a foreign government, military, security, defense industry, or intelligence service".

32. When interpreted unfairly in a vacuum, Mr. Angwang's answer of "No" could be regarded as untruthful given his contacts with PRC #2. Viewed in the context of his answers to the prior questionnaires, however, which by their very terms are cumulative and permanent, the answer cannot be viewed as anything other than truthful and consistent with his prior disclosures. His contacts with PRC #2, which began in 2018, mirrored the pattern of obsequious and deferential posturing that characterized his relationship with PRC #1. This behavior was nothing more than what is typical of any person confronted with the dictatorial power of a low-level bureaucrat – like any of us trying to renew a new license at DMV or in this case, any Tibetan with dreams of seeing their relatives. Indeed, this was Contact with a Foreign official of a consulate that pertained to a "routine visa application".

33. Notably, even if the "routine visa application language" is not read into the 2019 questionnaire at Question 6, which would be wildly unfair, Mr. Angwang disclosed on the 2019 addendum form that he had traveled to China in April-May 2012, to Hong Kong in October 2014, and to China again in December 2015, and that he had married his wife, a naturalized American citizen who had been born in China. (Exhibit C at 10, ¶¶ 3,12- under seal). And given that, as discussed above, travel to China by members of the Tibetan diaspora requires a visa that is individually vetted by the Chinese consulate, thus, requiring contact. Disclosure by Mr. Angwang that he had traveled to China effectively constituted disclosure that he had contact with officials in the consulate, because he would never have received permission to travel without such contact. Mr. Angwang was never interviewed in connection with his 2019 filing with requests for clarification, something the instructions speak about specifically. The result is the government's indictment for a false statement that has the feel of a game of "gotcha".

D.  **The Indictment.**

34. On October 13, 2020, a four-count indictment was lodged against Mr. Angwang. (ECF Doc. 20). Count One, relating to Mr. Angwang's alleged substantive relationship with the two officials at the Chinese embassy, charged Mr. Angwang with knowingly acting as an agent of a foreign government, to wit China, without notification to the Attorney General of the United States" in violation of 18 U.S.C. § 951(a). Counts Two through Four related to the security clearance applications. In Count Two, Mr. Angwang was charged with wire fraud under 18 U.S.C. § 1343,[4] specifically knowingly devising a scheme to obtain money and property from the United States by means of "a materially false SF-86 [q]uestionnaire." Count Three charged Mr. Angwang with false statements under 18 U.S.C. § 1001 by representing on the 2019 addendum form "that he had no contact with members of a foreign government" and "that he had no continuing contact with a foreign national with whom he was bound by affection, influence, common interests, and obligations when in fact... [he] was in contact with family members in the People's Republic of China." Finally, Count Four charged Mr. Angwang with obstruction of an official proceeding, namely his 2019 national security background investigation, in violation of 18 U.S.C. § 1512(c).

35. Now, for the reasons set forth below, this Court should dismiss all counts of the indictment on the basis that such counts fail to set forth an offense.

## POINT I

## THE INDICTMENT FAILS TO SET FORTH AN OFFENSE

36. Defendant first submits that none of the charges alleged in the indictment are sufficient to set forth a federal offense, because (1) he was not acting as an agent for a foreign

---

[4] Mr. Angwang *is not* charged with depriving the United States of his honest services under 18 U.S.C. § 1346.

government within the meaning of 18 U.S.C. § 951(a); and (2) his answers on the 2019 SF-86C addendum form were literally truthful and, in the case of the "bonds of affection" question, not even misleading given that the identities and locations of his family members in China had been repeatedly disclosed.

37. Defendant recognizes that under most circumstances, a federal indictment need only track the language of the relevant statute and that the sufficiency of the evidence before the grand jury is not within the Court's purview. However, where, as here, the government lodges a "speaking indictment" that does more than merely recite the statutory language and provides evidentiary detail concerning what the defendant is alleged to have done, this Court may consider whether "the defense is clear from the face of the indictment." See United States v. Sampson, 898 F.3d 270, 279 (2d Cir. 2018). There is also authority for considering evidentiary material outside the four corners of the indictment where such material is dispositive. See United States v. Gabriel, 920 F. Supp. 498, 505-07 (S.D.N.Y. 1996) (considering material outside the indictment in determining whether counts thereof were time-barred).

38. Moreover, there is specific authority for pretrial dismissal of an indictment predicated on a false statement where the statement is set forth in the indictment and, based on the documentary evidence available, the statement "cannot, under any set of circumstances, be proven false." See United States v. Subeh, 2006 WL 219968, *11-13 (W.D.N.Y. 2006) (recommending dismissal of grand jury testimony that could not possibly be anything other than the literal truth, even if misleading). In reaching this conclusion, the Subeh court cited United Tates v. Lighte, 782 F.2d 367, 369 (2d Cir. 1986), which had similarly found that a statement which could not be proven literally false could not form the basis of a perjury charge, as well as Bronston v. United States, 409 U.S. 3252, 355-57 (1973), which held generally that literally true

statements could not be the basis of federal prosecution. Defendant therefore submits that this Court can, and on this record should, review and dismiss the indictment in its entirety.

**A.    Count One.**

39.    Pursuant to 18 U.S.C. § 951(a), "[w]hoever, other than a diplomatic or consular officer or attaché, acts in the United States as an agent of a foreign government without prior notification to the Attorney General if required in subsection (b), shall be fined under this title or imprisoned not more than ten years, or both." The term "agent of a foreign government," means, with exceptions not applicable here, "an individual who agrees to operate within the United States *subject to the direction or control* of a foreign government or official." 18 U.S.C. § 951(c) (emphasis added). In this case, the Section 951(a) charge against Mr. Angwang should be dismissed because his alleged relationship with the PRC Officials was one that lacked any indicial whatsoever of "direction and control."

40.    In United States v. Rafiekian, 991 F.3d 529 (4th Cir. 2021), the Fourth Circuit recently discussed, for what appears to be the first time, the meaning of "direction or control" for purposes of Section 951. The Rafiekian court characterized being an agent for a foreign government as "similar to common-law agency." Id. at 538. Moreover, "[o]ne thing is clear right off the bat: To fall within § 951's ambit, a person must do more than act in parallel with a foreign government's interests or pursue a mutual goal." Id. at 539. Instead, the terms "direction or control" must be given their ordinary meanings, and there is "little practical daylight" between the word "direction" and the word "control," both of which import supervision, power, and/or authority. Id. And the court rejected the government's contention that Section 951 was implicated whenever the defendant "is willing to do something the foreign principal requests," finding that this construction as too far-reaching and declining to adopt it. Id. at 539-40. While

the relationship in question need not necessarily be "akin to an employer-employee relationship" and could be more informal than that, it must nevertheless involve direction or control. Id. at 540.

41. Defendant Angwang submits that his relationship with the PRC Officials, as detailed in the evidentiary material disclosed by the government decidedly supports the Rafiekian court's analysis regarding the need to demonstrate "direction and control." To be sure, Mr. Angwang wanted the PRC Officials to liberalize their visa party for his benefit and other Tibetans, even if the relationship between Angwang and the PRC officials has some mutual aspect to, which is far from clear, the Rafiekian court stated, acting to mutual benefit is not enough to create an agency relationship.

42. The simple fact is that Mr. Angwang did virtually nothing to help the Chinese consulate officials. What Mr. Angwang did in terms of inviting one PRC Official to a Jade dinner was no different from what officials of the NYPD and other Chinese officials, higher-ranking than Mr. Angwang or the PRC Officials, were doing at the same time. And as discussed above, Mr. Angwang *did not* offer military secrets or police secrets to either of the PRC Officials and did not even disclose to them that he was an Army Reservist, something that he would surely have done if he was actually an intelligence asset. Under any interpretation, the facts of this case do not amount to a foreign agency under Section 951 as interpreted by Rafiekian, and Count One should therefore be dismissed.

B.  **Counts Two through Four.**

43. The counts relating to the SF-86C addendum form must likewise be dismissed because none of the specific statements alleged in the indictment were literally false. Taking the Section 1001 charge first, it is well settled that such a charge may not be predicated upon a

literally true statement, even if that statement is misleading. See United States v. Mandanici, 729 F.2d 914, 921 (2d Cir. 1984) ("a defendant may not be convicted under § 1001 on the basis of a statement that is, although misleading, literally true"); Subeh, 2006 WL 219968, *11 (same, collecting cases). Here, both of the statements charged in the Section 1001 count were literally true within the meaning of the instructions given to Mr. Angwang at the time he submitted the addendum form.

44. As discussed above, the two questions at issue were the "bonds of affection" question and the "contact with a foreign government" question. As to the "bonds of affection" question, the indictment verges on frivolous. As discussed in the Statement of Facts and as shown in Exhibits D-E under seal, Mr. Angwang specifically disclosed his relationships with his parents and brother in response to question 18 on both the 2011 and 2014 SF-86 forms, and the subsequent question 19 applied only to relatives not already disclosed in response to question 18. Moreover, as also discussed above, the 2019 addendum form explicitly called for disclosure of only relationships of affection that had been "established" since the submission of the last full SF-86. Mr. Angwang was not required by this question to disclose relationships he had already twice disclosed and that the Department of Defense well knew of, and thus, his "no" answer was literally true. Hence, even if one were to argue it was misleading – and it is hard to imagine how Mr. Angwang's answer *would* be misleading, given that he had disclosed the identities and addresses of his parents and brother, and that he disclosed a 2012 trip to China for purposes of "family sickness" in response to question 12 of the same 2019 form – it cannot reasonably form the basis of a Section 1001 charge. See Subeh, supra.

45. The "contact with a foreign government" question should be treated with the same medicine. Here too, there was a literally truthful answer within the spirit and meaning of the

17

ongoing, cumulative disclosure process captured by the SF-86 form. The Foreign Government Contact question was modified by an exception for "routine visa applications" which was specifically detailed in the 2014 form. Why that instructional language was omitted from the 2019 form and without any notice of the changes, is not a variance that should be held against Mr. Angwang. The question as answered, with the caveat, was and is true. It cannot and should not form the basis for a federal felony charge under 1001. This Court should therefore dismiss the Section 1001 count as it relates to *both* charged statements.

46. Turning to the obstruction count, the defense of literal truth applies to such charges as well, as set forth in United States v. Thomas, 612 F.3d 1107, 1119-22 (9th Cir. 2010), in which the Ninth Circuit held that a defendant's proposed jury instruction, under which neither a false statement nor an obstruction conviction could be based on answers that are "literally true, even if [they have] an especially strong tendency to be misleading," not only had evidentiary support but was "supported by law." Again, both the "bonds of affection" answer and the "contact with a foreign government" answer were literally true when viewed in the context of the "permanent record" contained in his SF-86 filings.

47. Finally, as to the wire fraud count, it is again impossible to defraud the United States through the failure to re-disclose information that is already known to it, namely the existence of Mr. Angwang's family members in China and their relationships to Mr. Angwang. And yet again, it was not fraudulent to answer "no" to the SF-86C's question on whether he had any *new* relationships with foreign government officials, given that such relationships, as alleged by the government, involved contacts with consulate officials for the purpose of routine visa applications as specified in the 2014 version of the SF-86. Indeed, given that Mr. Angwang did disclose on the 2019 form that he had traveled to China on two occasions, and given that it is

well known to the Department of Defense that Tibetans traveling to China require individually vetted visas, this too was tantamount to disclosing that he had interacted with officials at the Chinese embassy because he could not have engaged in the travel without such interaction. This Court should therefore dismiss Counts Two through Four as well as Count One for failure to state an offense.

## CONCLUSION

**WHEREFORE**, in light of the foregoing, this Court pursuant to Fed. R. Crim. Pro. 12(3)(A) and (B) dismissing the indictment or specific counts thereof and granting such other and further relief to Defendant as this Court may deem just and proper.

Dated: Garden City, NY
       February 11, 2022

                                        /s/
                                JOHN F. CARMAN
                                (JC7149)